ROBERT BACON, RICHARD CAGLE, AND ELTON McLAUGHLIN v. R. C. LEE, WARDEN OF CENTRAL PRISON, MICHAEL F. EASLEY, GOVERNOR OF NORTH CAROLINA, & ROY COOPER, ATTORNEY GENERAL OF NORTH CAROLINA

No. 209A91-4

(Filed 2 August 2001)

**1. Constitutional Law— North Carolina—due process— clemency procedures—Governor was former Attorney General**

A plaintiff's attempt to impose additional constraints upon the Governor of North Carolina's discharge of clemency powers arising from alleged violations of plaintiff's due process rights, based on the fact that the Governor previously served as Attorney General of North Carolina and therefore counsel of record for the State during the majority of plaintiff's appellate and post-conviction proceedings, is unpersuasive and the trial court erred by restraining the Governor's consideration of plaintiff's clemency request in a capital case because: (1) clemency proceedings are conducted by the executive branch under its discretionary authority, independent of direct appeal and collateral relief proceedings; (2) minimal due process applicable to state clemency procedures do not include the right of an inmate seeking clemency to have his or her request reviewed by a Governor possessing the level of impartiality normally required of a judge presiding over an adjudicatory proceeding; (3) plaintiff received notice of clemency procedures and he has fully availed himself of these procedures; (4) plaintiff has not alleged that the Governor has or will render a decision in a manner that violates plaintiff's

rights; (5) despite the potential for the Governor's previous roles influencing his clemency determinations, the people of North Carolina have opted to vest their elected Governor with virtually plenary clemency authority under Article III, Section 5(6) of the North Carolina Constitution; and (6) the Rule of Necessity reveals that the Governor cannot delegate the exercise of the clemency authority under Article III, Section 5(6) of our Constitution, and there is no evidence that the Lieutenant Governor is required to act based on the Governor's inability to perform his duties.

2. **Constitutional Law— equal protection—cruel and unusual punishment—clemency procedures—Governor was former Attorney General**

   A plaintiff's attempt to impose additional constraints upon the Governor of North Carolina's discharge of clemency powers arising from alleged violations of plaintiff's equal protection rights and right to be free from cruel and unusual punishment under the United States Constitution, based on the fact that the Governor previously served as Attorney General of North Carolina and therefore counsel of record for the State during the majority of plaintiff's appellate and post-conviction proceedings, is unpersuasive and the trial court erred by restraining the Governor's consideration of plaintiff's clemency request in a capital case because: (1) plaintiff cannot show that he has been or will be treated differently than other similarly situated death row inmates for purposes of pursuing clemency; and (2) plaintiff's basic premise that clemency is constitutionally required in a capital punishment system is erroneous as a matter of law.

3. **Constitutional Law— North Carolina—law of the land clause—clemency procedures—Governor was former Attorney General**

   A plaintiff's attempt to impose additional constraints upon the Governor of North Carolina's discharge of clemency powers under the North Carolina Constitution arising under the law of the land clause of Article 1, based on the fact that the Governor previously served as Attorney General of North Carolina and therefore counsel of record for the State during the majority of plaintiff's appellate and post-conviction proceedings, is unpersuasive and the trial court erred by restraining the Governor's consideration of plaintiff's clemency request in a capital case because due process rights that apply to clemency procedures in

North Carolina extend no further than the minimal safeguards for due process rights.

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order issued 15 May 2001 by LaBarre, J., in Superior Court, Wake County, restraining the Governor of North Carolina, Michael F. Easley, from considering the clemency request of plaintiff Robert Bacon. Heard in the Supreme Court 7 June 2001.

*Thomas F. Loflin III for plaintiff-appellees; J. Kirk Osborn for plaintiff-appellee McLaughlin; and Stephen R. Greenwald, pro hac vice, for plaintiff-appellees Bacon and McLaughlin.*

*Roy A. Cooper, Attorney General, by Barry S. McNeill, Edwin W. Welch, and Valérie B. Spalding, Special Deputy Attorneys General, for defendant-appellants.*

MARTIN, Justice.

Plaintiffs instituted the instant civil action to challenge the constitutionality of the Governor's exercise of his clemency power under Article III, Section 5(6) of the Constitution of North Carolina.[1]

Plaintiff Robert Bacon (Bacon) was convicted of the first-degree murder of Glennie Leroy Clark at the 18 May 1987 Criminal Session of Superior Court, Onslow County. After a capital sentencing proceeding, the jury recommended a sentence of death, and the trial court entered judgment in accordance with that recommendation. On 5 April 1990 this Court found no error in Bacon's first-degree murder conviction but remanded the case to the trial court for a new capital sentencing proceeding. *State v. Bacon*, 326 N.C. 404, 390 S.E.2d 327 (1990). On 19 February 1991 a second jury recommended the death penalty, and the trial court entered judgment in accordance with that recommendation. On 29 July 1994 this Court found no error in Bacon's capital sentencing proceeding. *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994). On 21 February 1995 the United States Supreme Court denied Bacon's petition for writ of certiorari. *Bacon v. North Carolina*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

On 25 September 1995 Bacon filed a motion for appropriate relief (MAR) in Superior Court, Onslow County. On 20 November 1995 the

---

1. We assume, for purposes of the present case, that jurisdiction is proper under 42 U.S.C. § 1983. *See, e.g., Martinez v. California*, 444 U.S. 277, 283 n.7, 62 L. Ed. 2d 481, 488 n.7 (1980).

trial court denied Bacon's MAR. On 15 February 1996 Bacon filed a motion to reconsider the denial of his MAR. The trial court granted Bacon's motion and heard oral argument. On 10 May 1996 the trial court issued an order denying all claims within Bacon's MAR. On 7 February 1997 this Court denied Bacon's petition for writ of certiorari to review the trial court's order. *State v. Bacon*, 345 N.C. 348, 483 S.E.2d 179 (1997). On 6 October 1997 the United States Supreme Court denied Bacon's petition for writ of certiorari. *Bacon v. North Carolina*, 522 U.S. 843, 139 L. Ed. 2d 75 (1997).

On 26 November 1997 Bacon filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. That court granted the writ as to Bacon's claim of ineffective assistance of counsel. Bacon and the State of North Carolina both appealed to the United States Court of Appeals for the Fourth Circuit. On 30 August 2000 the Fourth Circuit reversed the district court on Bacon's claim of ineffective assistance of counsel and otherwise affirmed the district court's denial of relief. *Bacon v. Lee*, 225 F.3d 470 (4th Cir. 2000). On 26 March 2001 the United States Supreme Court denied Bacon's petition for writ of certiorari. *Bacon v. Lee*, —— U.S. ——, 149 L. Ed. 2d 360 (2001). On 9 May 2001 Bacon submitted a clemency request to the Governor of North Carolina.

Governor Easley served as Attorney General of North Carolina from January 1993 to January 2001 and therefore served as counsel of record for the State of North Carolina during the majority of Bacon's appellate and post-conviction proceedings.

Plaintiff Richard Cagle (Cagle) was convicted of the first-degree murder of Dennis Craig House and was thereafter sentenced to death at the 15 June 1995 Criminal Session of Superior Court, Cumberland County. On 24 July 1997 this Court found no error in Cagle's first-degree murder conviction and death sentence. *State v. Cagle*, 346 N.C. 497, 488 S.E.2d 535 (1997). On 15 December 1997 the United States Supreme Court denied Cagle's petition for writ of certiorari. *Cagle v. North Carolina*, 522 U.S. 1032, 139 L. Ed. 2d 614 (1997).

Cagle filed a MAR in 1998, which the trial court denied in 2000. Cagle filed a motion to reconsider the denial of his MAR in March 2000, which was denied in November 2000. On 11 January 2001 the trial court entered an amended order dismissing Cagle's MAR upon reconsideration.

Governor Easley served as Attorney General of North Carolina and therefore served as counsel of record for the State of North Carolina during Cagle's appellate and post-conviction proceedings from 1995 until January 2001.

Plaintiff Elton McLaughlin (McLaughlin) was convicted of the first-degree murders of James Elwell Worley, Shelia Denise Worley, and Psoma Wine Baggett at the 10 September 1984 Special Session of Superior Court, Bladen County. After a capital sentencing proceeding, the trial court sentenced McLaughlin to death for the James Worley murder and to life imprisonment for the other two murders. On 7 September 1988 this Court found no error in McLaughlin's convictions and sentences. *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988). The United States Supreme Court thereafter granted certiorari and vacated the death sentence in light of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). *McLaughlin v. North Carolina*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990).

On 3 October 1991 this Court remanded the case for a new capital sentencing proceeding. *State v. McLaughlin*, 330 N.C. 66, 408 S.E.2d 732 (1991). McLaughlin was again sentenced to death in 1993. On 8 September 1995 this Court found no error in his second capital sentencing proceeding. *State v. McLaughlin*, 341 N.C. 426, 462 S.E.2d 1 (1995). On 20 February 1996 the United States Supreme Court denied McLaughlin's petition for writ of certiorari. *McLaughlin v. North Carolina*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996).

In 1997 McLaughlin filed a MAR in Superior Court, Bladen County, which the trial court denied in 1998. On 24 June 1999 this Court denied McLaughlin's petition for writ of certiorari to review the trial court's order denying his MAR. *State v. McLaughlin*, 537 S.E.2d 489 (N.C. 1999). On 19 November 1999 the United States Supreme Court denied McLaughlin's petition for writ of certiorari. *McLaughlin v. North Carolina*, 528 U.S. 1025, 145 L. Ed. 2d 418 (1999). McLaughlin has since initiated habeas corpus proceedings in the United States District Court for the Eastern District of North Carolina.

Governor Easley served as District Attorney for the Thirteenth Prosecutorial District, which includes Bladen County, from 1982 to 1992. In this capacity he served as "the local prosecutor" at McLaughlin's trial in 1984. As noted above, the United States Supreme Court vacated McLaughlin's 1984 death sentence in 1990. *McLaughlin v. North Carolina*, 494 U.S. 1021, 108 L. Ed. 2d 601. McLaughlin

received his second death sentence in 1993. The imposition of this death sentence, as well as part of McLaughlin's appeal and post-conviction proceedings arising therefrom, occurred during Governor Easley's service as Attorney General of North Carolina.

On 11 May 2001 plaintiffs instituted the instant civil action with the filing of a complaint entitled, "Class Action: Complaint for Temporary, Preliminary & Permanent Injunctive Relief & for a Declaratory Judgment." Named defendants include R. C. Lee, Warden of Central Prison in Raleigh; Michael F. Easley, Governor of North Carolina; and Roy Cooper, Attorney General of North Carolina.

Plaintiffs allege in their first claim for relief that they have "the right to petition for [executive] clemency at any time after conviction, pursuant to Art. III, § 5(6) of the North Carolina Constitution," and that they have a due process right under Article I, Sections 1, 19, 21, 27, and 35 of the North Carolina Constitution and the Eighth and Fourteenth Amendments to the United States Constitution for their clemency petition to "be considered and decided by a neutral and impartial decision maker, untainted by his prior participation in [any] Plaintiff's prosecution." Plaintiffs allege that because Governor Easley "was the Attorney General of North Carolina throughout part, or all, of each and every Plaintiff's appellate and post-conviction review proceedings in state and/or federal court, and was also the local prosecutor in the initial trial proceedings of Plaintiff McLaughlin, he has an inherent conflict of interest that precludes him from fairly considering any Plaintiff's clemency request, and [therefore] does not qualify as a neutral and impartial decision maker."

Plaintiffs' second claim for relief is "grounded in each of the Plaintiffs' [sic] cognizable liberty interest in his continued life and existence, and his right, under the North Carolina Constitution and the U.S. Constitution, to equal protection of law against deprivation of such cognizable interest." Plaintiffs further allege, upon information and belief, that there is a class of "five convicted capital defendants under sentence of death in North Carolina who were not involved in litigation in opposition to the Attorney General's Office when Defendant Easley was the Attorney General." According to plaintiffs, Governor Easley may consider clemency petitions originating from that class of five death row inmates without violating those inmates' due process rights. In contrast, because of previous proceedings involving Governor Easley and the class consisting of plaintiffs and putative class members, clemency requests arising

**BACON v. LEE**

[353 N.C. 696 (2001)]

from within this class of persons "will be considered and decided by a party who does not qualify as a neutral and impartial decision maker, resulting in unconstitutionally disparate treatment and a denial of equal protection of the law under Art. I, §§ 1, 19, 21, 27 & 35 of the North Carolina Constitution and under the Eighth [Amendment] and equal protection and due process clauses of the Fourteenth Amendment to the U.S. Constitution."

Plaintiffs, in their third claim for relief, allege a "cruel and unusual punishment [claim] under the Eighth and Fourteenth Amendments to the U.S. Constitution, and under Art. I, §§ 19 & 27 of the North Carolina Constitution."

In their prayer for relief, plaintiffs seek injunctive relief and entry of "a declaratory judgment that the exercise of the power of clemency by Defendant Easley with respect to any of the Plaintiffs would constitute a violation of such Plaintiff's rights to due process, equal protection of the law and freedom from cruel and unusual punishment under the state and federal constitutions, and in violation of 42 U.S.C. § 1983."

On 14 May 2001 defendants filed a response in the trial court alleging plaintiffs were not entitled to relief as a matter of law. On 15 May 2001 the trial court issued a temporary restraining order that stayed Bacon's execution scheduled for 18 May 2001 and restrained Governor Easley from considering Bacon's clemency request. Also, on 15 May 2001, defendants filed directly in this Court their "Emergency Petitions for Writs of Certiorari, Prohibition & Supersedeas, and Motion to Vacate Superior Court's Order and to Dismiss Bacon's Civil Complaint," to which plaintiffs filed a response.

On 15 May 2001 this Court, pursuant to N.C. R. App. P. 2, vacated the trial court's temporary restraining order to the extent it prohibited or restrained the Governor of North Carolina from conducting a clemency hearing in Bacon's case under Article III, Section 5(6) of the Constitution of North Carolina. Later that day, Governor Easley met with attorneys and representatives for Bacon and with attorneys for the State of North Carolina.[2]

On 17 May 2001 this Court, in the exercise of its supervisory authority pursuant to Article IV of the Constitution of North Carolina

---

2. On 19 July 2001 Governor Easley's office advised the Clerk of this Court that Bacon's clemency request remained pending before the executive authority.

BACON v. LEE

[353 N.C. 696 (2001)]

and N.C. R. App. P. 2, entered an order allowing the defendants' emergency petition for writ of certiorari, staying any further proceedings in the trial court, and calendaring this matter for oral argument before this Court on 7 June 2001. In its order, the Court expressed "no opinion as to the merit, or lack of merit, of Plaintiffs' legal challenge to the Governor's power of executive clemency under Article III, Section 5(6) of the Constitution of North Carolina."

I.

Before addressing the allegations raised in the instant complaint, we briefly consider the background of the doctrine of executive clemency and the justiciability of clemency procedures. First, the genesis of executive clemency in the United States is found in the English common law. *See, e.g., Herrera v. Collins*, 506 U.S. 390, 411-12, 122 L. Ed. 2d 203, 224 (1993); *Schick v. Reed*, 419 U.S. 256, 262, 42 L. Ed. 2d 430, 436 (1974); *Ex parte Grossman*, 267 U.S. 87, 110, 69 L. Ed. 527, 531 (1925); *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160, 8 L. Ed. 640, 643-44 (1833). In *Wilson*, Chief Justice Marshall stated:

> As this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.

32 U.S. (7 Pet.) at 160, 8 L. Ed. at 643-44.

In England the power to grant pardons belonged almost exclusively to the Monarch. *See Schick*, 419 U.S. at 260-62, 42 L. Ed. 2d at 435-36 ("by 1787 the English prerogative to pardon was unfettered except for a few specifically enumerated limitations" such as impeachments). Traditionally, the exercise of clemency authority has been considered "a matter of grace," *see, e.g., Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 280-81, 140 L. Ed. 2d 387, 396 (1998), or "an act of grace," *see, e.g., Wilson*, 32 U.S. (7 Pet.) at 160, 8 L. Ed. at 644. Clemency was designed to give the executive the authority to exempt "the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed." *Id.* In *Ex parte Grossman*, the United States Supreme Court observed that clemency "may afford relief from [the] undue harshness or evident

mistake in the operation or enforcement of the criminal law." 267 U.S. at 120, 69 L. Ed. at 535.

The United States Supreme Court recently reaffirmed the traditional conception of clemency as an Executive Branch function separate from adjudicatory proceedings within the Judicial Branch. *See Herrera*, 506 U.S. at 411-13, 122 L. Ed. 2d at 224-25. The Court noted that one of the great advantages of clemency in England was " 'that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the general law, in such criminal cases as merit an exemption from punishment.' " *Id.* at 412, 122 L. Ed. 2d at 224 (quoting 4 William Blackstone, *Commentaries on the Laws of England* \*397). Consequently, "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464, 69 L. Ed. 2d 158, 165 (1981).

We observe that all fifty states have incorporated clemency provisions in their respective constitutions.[3] The people of North Carolina have vested their Governor with virtually absolute clemency authority since the adoption of their first Constitution in 1776. *See* N.C. Const. of 1776, § XIX ("[T]he Governor . . . shall have the Power of granting Pardons and Reprieves, except where the Prosecution shall be carried on by the General Assembly . . . ."). In that first Constitution, the people vested the pardon and reprieve power exclusively in the Governor, their executive. In the Constitution of 1868, the people of North Carolina again vested their executive with plenary authority to grant reprieves, commutations, and pardons, "after conviction, for all offences, (except in cases of impeachment,)

---

3. See Ala. Const. amend. 38; Alaska Const. art. III, § 21; Ariz. Const. art. V, § 5; Ark. Const. art. VI, § 18; Cal. Const. art. V, § 8; Colo. Const. art. IV, § 7; Conn. Const. art. IV, § 13; Del. Const. art. VII, § 1; Fla. Const. art. IV, § 8; Ga. Const. art. IV, § 2; Haw. Const. art. V, § 5; Idaho Const. art. IV, § 7; Ill. Const. art. V, § 12; Ind. Const. art. V, § 17; Iowa Const. art. 4, § 16; Kan. Const. art. I, § 7; Ky. Const. § 77; La. Const. art. IV, § 5(E); Me. Const. art. V, pt. 1, § 11; Md. Const. art. II, § 20; Mass. Const. pt. II, ch. 2, § 1, art. 8; Mich. Const. art. V, § 14; Minn. Const. art. V, § 7; Miss. Const. art. V, § 124; Mo. Const. art. IV, § 7; Mont. Const. art. VI, § 12; Neb. Const. art. IV, § 13; Nev. Const. art. V, § 13; N.H. Const. pt. 2, art. 52; N.J. Const. art. V, § 2; N.M. Const. art. V, § 6; N.Y. Const. art. IV, § 4; N.C. Const. art. III, § 5(6); N.D. Const. art. V, § 7; Ohio Const. art. III, § 11; Okla. Const. art. VI, § 10; Or. Const. art. V, § 14; Pa. Const. art. IV, § 9; R.I. Const. art. IX, § 13; S.C. Const. art. IV, § 14; S.D. Const. art. IV, § 3; Tenn. Const. art. III, § 6; Tex. Const. art. IV, § 11; Utah Const. art. VII, § 12; Vt. Const. ch. II, § 20; Va. Const. art. V, § 12; Wash. Const. art. III, § 9; W. Va. Const. art. VII, § 11; Wis. Const. art. V, § 6; Wyo. Const. art. IV, § 5.

upon such conditions as he may think proper . . . ." N.C. Const. of 1868, art. III, § 6. Under the Constitution of 1971, the third and present State Constitution, the power to grant pardons, reprieves, and commutations continues to be the exclusive prerogative of the executive. The Constitution provides in part:

> The Governor may grant reprieves, commutations, and pardons, after conviction, for all offenses (except in cases of impeachment), upon such conditions as he may think proper, subject to regulations prescribed by law relative to the manner of applying for pardons.

N.C. Const. art. III, § 5(6).[4]

Plaintiffs contend that the United States Supreme Court effectively overruled its prior jurisprudence regarding executive clemency procedures in *Ohio Adult Parole Auth. v. Woodard,* 523 U.S. 272, 140 L. Ed. 2d 387 (1998). According to plaintiffs, "*Woodard* completely changed the landscape, and swept away the precedential value of any cases decided before it that turned on the notion that clemency proceedings were immune from due process safeguards."

In *Woodard,* the defendant was sentenced to death in the state courts of Ohio for an aggravated murder committed in the course of a carjacking. *Woodard,* 523 U.S. at 277, 140 L. Ed. 2d at 393. When he failed to obtain a stay of execution more than forty-five days prior to his scheduled execution date, the Ohio Adult Parole Authority (the Authority) informed the defendant, with three days' notice, that on 9 September 1994 he could have a clemency interview, followed by a hearing on 16 September. *Id.* at 277, 289, 140 L. Ed. 2d at 394, 401. In response, the defendant did not request an interview but instead objected to the proposed date for the interview and requested that his counsel be permitted to attend, and participate in, the clemency interview and hearing. *Id.* at 277, 140 L. Ed. 2d at 394. The Authority failed to respond to the defendant's requests. *Id.* On 14 September 1994 the defendant filed suit in the United States District Court for

---

4. N.C.G.S. § 147-21 prescribes the form and content of a pardon application. It provides:

> Every application for pardon must be made to the Governor in writing, signed by the party convicted, or by some person in his behalf. And every such application shall contain the grounds and reasons upon which the executive pardon is asked, and shall be in every case accompanied by a certified copy of the indictment, and the verdict and judgment of the court thereon.

N.C.G.S. § 147-21 (1999).

the Southern District of Ohio alleging that Ohio's clemency process violated, among other things, his Fourteenth Amendment due process rights. *Woodard v. Ohio Adult Parole Auth.*, 107 F.3d 1178, 1181-82 (6th Cir. 1997).

The district court granted the State of Ohio's motion for judgment on the pleadings. *Id.* at 1181. On appeal, the United States Court of Appeals for the Sixth Circuit affirmed in part and reversed in part. *Id.* at 1194. The court determined that there was no federally created life or liberty interest in clemency. *Id.* at 1183-84 (relying on *Dumschat*, 452 U.S. at 464-65, 69 L. Ed. 2d at 164-66). Because the Governor's decision to grant clemency remained within his sole discretion, regardless of the Authority's recommendation, the court also determined that the defendant did not have any state-created life or liberty interest in clemency. *Id.* at 1184-85. The court then considered a "second strand" of due process analysis "center[ed] on the role of clemency in the entire punitive scheme." *Id.* at 1186. Relying on *Evitts v. Lucey*, 469 U.S. 387, 393, 83 L. Ed. 2d 821, 827 (1985), the Sixth Circuit observed that "[t]he Constitution does not require a state . . . to provide a system of appeals, but if the state chooses to do so, the appeal, too, must comply with the basic requirements of due process." *Woodard*, 107 F.3d at 1186. According to the court, this reasoning applied to other post-conviction avenues of relief made available by the government, including clemency. *Id.* The court determined that "due process at the clemency stage will necessarily be minimal . . . because of the great distance from the truly fundamental process." *Id.* at 1187. As a result, the Sixth Circuit remanded the case to the district court to address defendant's due process claim under this "second strand of due process analysis." *Id.* at 1188.

The United States Supreme Court reversed the Sixth Circuit's decision. The Court's principal opinion, a plurality opinion of four justices authored by Chief Justice Rehnquist, reaffirmed the *Dumschat* holding—that clemency decisions " 'have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.' " *Woodard*, 523 U.S. at 276, 140 L. Ed. 2d at 395-96 (quoting *Dumschat*, 452 U.S. at 464, 69 L. Ed. 2d at 165). According to the principal opinion, "[c]lemency proceedings are not part of the trial—or even of the adjudicatory process. They do not determine the guilt or innocence of the defendant . . . . They are conducted by the executive branch, independent of direct appeal and collateral relief proceedings." *Id.* at 284, 140 L. Ed. 2d at 398. If the procedural constraints that Woodard requested were implemented,

"the executive's clemency authority would cease to be a matter of grace committed to the executive authority." *Id.* at 285, 140 L. Ed. 2d at 399. Accordingly, the Court determined that Ohio's clemency procedures did not violate the Fourteenth Amendment Due Process Clause. *Id.* at 288, 140 L. Ed. 2d at 400-01.

Justice O'Connor, concurring by separate opinion, determined that a prisoner under a death sentence retains a life interest after proper conviction to which due process safeguards attach. *Id.* at 289, 140 L. Ed. 2d at 401 (O'Connor, J., concurring). She concluded that "some *minimal* procedural safeguards apply to clemency proceedings." *Id.* "Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.* Justice O'Connor ultimately concluded, however, that none of the defendant's allegations "amount[ed] to a due process violation" as a matter of law. *See id.* at 290, 140 L. Ed. 2d at 402 (no remand to district court necessary in order to make factual determinations on Woodard's due process claim).

Justice Stevens, concurring in part and dissenting in part, stated that a prisoner retained a "life interest protected by the Due Process Clause." *Id.* at 292, 140 L. Ed. 2d at 403 (Stevens, J., concurring in part and dissenting in part). He concluded that because clemency proceedings involved the "final stage of the decisional process that precedes an official deprivation of life," they must satisfy the basic requirements of due process. *Id.* at 295, 140 L. Ed. 2d at 405. Accordingly, Justice Stevens stated in dissent that the case should be remanded to the district court to determine "whether Ohio's procedures meet the minimum requirements of due process." *Id.*

Justice O'Connor's concurring opinion represents the holding of the Court because it was decided on the narrowest grounds and provided the fifth vote. *See Romano v. Oklahoma*, 512 U.S. 1, 9, 129 L. Ed. 2d 1, 11 (1994) (the Court acknowledged the fifth vote and concurrence on narrow grounds is controlling); *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 49 L. Ed. 2d 859, 872 n.15 (1976) ("the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). Three justices joined in the principal opinion authored by Chief Justice Rehnquist, and three justices concurred in Justice O'Connor's concurring opinion. Thus, eight justices essentially concluded that Woodard's due process allegations failed as a matter of law.

II.

[1] The primary question presented by the instant case is whether Governor Easley's consideration of clemency requests from plaintiffs or putative class members violates the Fourteenth Amendment Due Process Clause in light of the *Woodard* decision. More particularly, we must determine whether the minimal due process applicable to state clemency procedures includes the right of an inmate seeking clemency to have his or her request reviewed by an executive possessing the level of impartiality normally required of a judge presiding over an adjudicatory proceeding.

As a preliminary matter, we note that, pursuant to Article III, Section 5(6) of the State Constitution, the Governor may grant clemency at any time "after conviction." N.C. Const. art. III, § 5(6). Nevertheless, we take judicial notice of the fact that the executive in North Carolina does not ordinarily consider clemency requests in capital cases until the applicant has exhausted all avenues of relief within the federal and state judiciary. We recognized this custom and practice of the executive in our order of 17 May 2001, where we observed that *Woodard* claims "will normally only be raised after finality has attached to the capital murder conviction in our criminal courts and the condemned inmate has made his [or her] final plea for mercy to the Governor."

Apart from Bacon, the instant record does not reflect that Cagle, McLaughlin, or any putative class member has exhausted his or her federal and state post-conviction remedies. In the absence of this threshold showing, the claims asserted by these named plaintiffs and putative class members are not ripe for review. *Cf. United States v. Smith*, 96 F.3d 1350, 1351 (11th Cir. 1996) (per curiam); *Samra v. State*, 771 So. 2d 1108, 1117 (Ala. Crim. App. 1999), *aff'd*, 771 So. 2d 1122 (Ala.), *cert. denied*, 531 U.S. 933, 148 L. Ed. 2d 255 (2000). Moreover, we do not address the claims asserted by the putative class members because the instant action has not been certified as a class action. Accordingly, we remand the claims asserted by Cagle and McLaughlin to the trial court for entry of an order of dismissal without prejudice.

We review Bacon's claims pursuant to our supervisory authority under Article IV of the Constitution of North Carolina and N.C. R. App. P. 2. The Rules of Civil Procedure do not apply to proceedings in this Court. *See* N.C.G.S. § 1A-1, Rule 1 (1999) ("These rules

shall govern the procedure in the superior and district courts of the State of North Carolina."). We now consider Bacon's due process claim.

We initially note that, since *Woodard*, the federal courts have generally followed a cautious approach to the question of the amount of process due inmates seeking clemency. For instance, in *Roll v. Carnahan*, 225 F.3d 1016 (8th Cir. 2000), prisoners in Missouri contended their Governor could not be fair and impartial when considering clemency petitions because he was engaged in a campaign for the United States Senate where one of the issues was clemency in capital cases. *Id.* at 1017. While recognizing that *Woodard* ensured minimal due process rights within clemency proceedings, the court concluded the "complaint that the governor will not be objective fail[ed]" because clemency decisions were left to the sole discretion of the Governor under the Missouri Constitution. *Id.* at 1018.

Similarly, in *Duvall v. Keating*, 162 F.3d 1058 (10th Cir.), *cert. denied*, 525 U.S. 1061, 142 L. Ed. 2d 571 (1998), a prisoner argued he was denied due process in his pursuit of clemency because the Governor of Oklahoma had previously stated he would not grant clemency to murderers. *Id.* at 1060. The Oklahoma Constitution provided for a clemency petition to be reviewed by the Pardon and Parole Board (the Board) following an impartial investigation. *Id.* Although the Governor's decision was discretionary, he could commute a sentence only upon the favorable recommendation of the Board. *Id.* In that case, the Board deadlocked and thus did not send a recommendation to the Governor. *Id.* The court, relying on *Woodard*, held:

> Because clemency proceedings involve acts of mercy that are not constitutionally required, the minimal application of the Due Process Clause only ensures a death row prisoner that he or she will receive the clemency procedures explicitly set forth by state law, and that the procedure followed in rendering the clemency decision will not be wholly arbitrary, capricious or based upon whim, for example, flipping a coin.

*Id.* at 1061. The court declined to review "the substantive merits of the clemency decision." *Id.* (citing *Dumschat*, 452 U.S. at 464, 69 L. Ed. 2d at 165). Because the prisoner had not shown he was deprived of any procedure allowed him by the State Constitution or otherwise shown that the procedures used were arbitrary, the court

concluded that the prisoner had not been denied due process. *Id.* at 1061-62.

In another case, a prisoner alleged he had been denied due process in pursuit of clemency for various reasons, including that the State Attorney General had formerly served as his prosecutor and later as counsel to the Parole Board and counsel to the Governor. *Workman v. Summers*, 136 F. Supp. 2d 896, 897 (M.D. Tenn. 2001). The court held that "[t]he decision of the Governor to grant or deny clemency is not reviewable" and limited its analysis to a review of state clemency procedures. *Id.* at 898. Because the prisoner had not shown that he had been denied access to the clemency process or had been subjected to an arbitrary determination or arbitrary procedure, the court held that he had received "the minimal due process required for a clemency proceeding." *Id.* at 899.

The United States Court of Appeals for the Fourth Circuit considered, and rejected, a similar claim in *Buchanan v. Gilmore*, 139 F.3d 982 (4th Cir. 1998), albeit before the issuance of *Woodard*. There, the court reviewed a claim that the Governor of Virginia should be disqualified from considering a prisoner's application for clemency because he had served as Attorney General in prior proceedings in that prisoner's case. *Buchanan*, 139 F.3d at 983. The court ordered the case to be dismissed, concluding the prisoner essentially sought a second, procedurally barred, habeas corpus review through his section 1983 petition. *Id.* at 984. It noted that under Virginia law the Lieutenant Governor was authorized to act only when the Governor was unable to discharge his duties, and cited with approval another federal decision applying the "Rule of Necessity" to clemency proceedings in similar situations. *Id.* at 983-84 (citing *Pickens v. Tucker*, 851 F. Supp. 363 (E.D. Ark.), *aff'd*, 23 F.3d 1477 (8th Cir.), *cert. denied*, 511 U.S. 1079, 128 L. Ed. 2d 457 (1994)).

We find the rationale of these decisions persuasive and conclude that Bacon has not alleged any cognizable violation of his due process rights in connection with the clemency procedures available to him under North Carolina law. We do not believe *Woodard* intended to repudiate entirely the cardinal principle that clemency decisions are normally not a matter to be litigated in courts of law. *See, e.g., Dumschat*, 452 U.S. at 464, 69 L. Ed. 2d at 165. Instead, we conclude, after review of *Woodard*, that state clemency procedures generally comport with due process when a prisoner is afforded notice and the opportunity to participate in clemency procedures,

BACON v. LEE

[353 N.C. 696 (2001)]

and the clemency decision, though substantively a discretionary one,[5] is not reached by means of a procedure such as a coin toss. *See Woodard*, 523 U.S. at 289-90, 140 L. Ed. 2d at 401-02 (O'Connor, J., concurring). Our consideration of the amount of process due Bacon incidental to his clemency request is guided in part by Justice O'Connor's observation in *Woodard*: "It is clear that 'once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly.'" 523 U.S. at 288, 140 L. Ed. 2d at 401 (quoting *Ford v. Wainwright*, 477 U.S. 399, 429, 91 L. Ed. 2d 335, 359 (1986) (O'Connor, J., concurring in result in part and dissenting in part)).

In our view, Bacon's due process rights are not violated by Governor Easley's consideration of his clemency request. It is undisputed that Bacon received notice of clemency procedures and that he has fully availed himself of these procedures. Moreover, Bacon has not alleged that Governor Easley has, or will, render a decision in a manner that violates *Woodard*. Bacon contends, however, that Governor Easley "has an inherent conflict of interest that precludes him from fairly considering" Bacon's clemency request because of his prior service as Attorney General of North Carolina.

We disagree with Bacon's assertion that the people's elected executive could be divested of one of his or her express constitutional powers, in this case the exclusive authority over clemency decisions under Article III, Section 5(6) of the Constitution of North Carolina, because he or she previously served as Attorney General. All executives assume office after a unique composite of life experiences which undoubtedly influences their discharge of clemency power. Despite the potential for the executive's previous roles— whether as attorney, chemist, farmer, or otherwise—to influence his or her clemency determinations, the people of North Carolina have nonetheless opted to vest their Governor with virtually plenary clemency authority.

Significantly, Governor Easley is not the first North Carolina executive to have served previously as Attorney General. In 1917 former Attorney General Thomas Bickett assumed the office of

---

5. By referring to the exercise of the executive's clemency authority as substantively discretionary, we observe that the decision to grant or deny clemency in any particular case is entirely dependent, at least in North Carolina, on the individual discretion of the executive. Our intent here is to distinguish between the necessarily discretionary nature of the clemency decision "on the merits" and *Woodard's* procedural requirements.

Governor of North Carolina. As Governor, Bickett considered, and granted, a number of clemency, pardon, and reprieve petitions from prisoners whose appeals he had handled while serving as Attorney General. See *State v. Foster*, 172 N.C. 960, 90 S.E. 785 (1916) (Attorney General Bickett personally signed the State's brief; argued the State's case before this Court; and later, as Governor, granted Foster a commutation); *State v. Johnson*, 172 N.C. 920, 90 S.E. 426 (1916) (Attorney General Bickett personally signed the State's brief on appeal and later commuted Johnson's sentence).[6] Both then, and now, acceptance of Bacon's argument would undeniably repudiate the people's constitutional election concerning the role of their elected executive within the clemency process. *See* N.C. Const. of 1868, art. III, § 6; N.C. Const. of 1971, art. III, § 5(6). After careful review, we are unpersuaded that *Woodard* intended to disrupt the orderly role of the executive in discharging clemency power by making his or her background or previous life experiences a justiciable controversy under the Due Process Clause of the Fourteenth Amendment. Our holding remains unaltered regardless of whether Bacon's due process allegations are premised on an "inherent conflict of interest" theory, as alleged in the complaint, or on an "actual bias" theory, as asserted in brief before this Court.

Our conclusion is supported by the nature of executive clemency and its constitutional placement within our tripartite system of government. The nature of executive clemency is fundamentally different than adjudicatory proceedings within the Judicial Branch of government. A primary goal of adjudicatory proceedings is the uniform application of law. In furtherance of this objective, courts generally consider themselves bound by prior precedent, *i.e.*, the doctrine of *stare decisis*. *See, e.g., Payne v. Tennessee*, 501 U.S. 808, 827, 115 L. Ed. 2d 720, 736-37 (1991) ("*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."); *Bulova Watch Co. v. Brand Distribs.*, 285 N.C. 467, 472, 206 S.E.2d 141, 145 (1974) (observing that *stare decisis* "promotes stability in the law and uniformity in its application").

---

6. Bacon notes, and we acknowledge, that Bickett served as Governor before the advent of modern due process jurisprudence. We also recognize, however, that historic custom and practice are relevant to the determination of the amount of process due in a particular context. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 675-79, 51 L. Ed. 2d 711, 733-35 (1977) (reviewing the historic practice of corporal punishment in schools in determining the process due a student being disciplined).

Furthermore, courts generally consider only evidence of record in their disposition of adjudicatory proceedings. As recognized by the United States Supreme Court: " 'It is a constituent part of the judicial system that the judge sees only with judicial eyes . . . . The looseness which would be introduced into judicial proceedings would prove fatal to the great principles of justice, if the judge might notice and act upon facts not brought regularly into the cause.' " *Herrera*, 506 U.S. at 413, 122 L. Ed. 2d at 225 (quoting *Wilson*, 32 U.S. (7 Pet.) at 161, 8 L. Ed. at 644).

In contrast, because the nature of clemency is inherently one of executive "grace" or "mercy," the decision to grant or deny a clemency request does not bind the executive, or his or her successor, in future clemency reviews.

> The purpose of vesting the power of judgment in an official is to enable him to make different decisions in different cases in the light of what he determines to be materially different factual situations. . . .
>
> . . . .
>
> . . . The exercise by one Governor of this judgment, resulting in the commutation of the sentence of one man convicted of murder . . . and the refusal to commute the sentence of another convicted of such crime, cannot be called "freakish" or "arbitrary" merely because another Governor might, theoretically, have reached opposite conclusions.

*State v. Jarrette*, 284 N.C. 625, 657-58, 202 S.E.2d 721, 742-43 (1974), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1206 (1976); *see also* John V. Orth, *The North Carolina State Constitution: A Reference Guide* 97 (1993). Also, unlike judicial proceedings, the clemency decision-maker is generally not limited in discharging his or her extrajudicial function by rules of evidence, rules of procedure, or other indicia of judicial proceedings. *Cf. Dumschat*, 452 U.S. at 466, 69 L. Ed. 2d at 166 (recognizing that "unfettered discretion" conferred on Connecticut's Board of Pardons placed "no limit on what procedure is to be followed, what evidence may be considered, or what criteria are to be applied"); *Whitaker v. State*, 451 S.W.2d 11, 15 (Mo. 1970) ("The exercise of the power of pardon lies in the uncontrolled discretion of the governor, and in determining whether to exercise the power he is not restricted by strict rules of evidence."); Janice Rogers Brown, *The Quality of Mercy*, 40 UCLA L. Rev. 327,

331 (1992) ("Clemency involves a search for answers that goes beyond judicial fact-finding . . . ."). Finally, the clemency decision is necessarily influenced by the unique background and life experiences, and presumably the social and political philosophy, of the executive decision-maker.

As one commentator stated in highlighting differences between judicial proceedings and the exercise of clemency authority:

*Mercy cannot be quantified or institutionalized.* It is properly left to the conscience of the executive entitled to consider pleas and should not be bound by court decisions meant to do justice.

. . . .

*Mercy is not the same as justice nor is it the opposite. Executive clemency allows for discretion in a way that courtroom procedure cannot.* It broadens the relevance of the philosophical and moral implications of an individual crime in a way that a judicial determination of guilt or innocence should not. As one clemency applicant eloquently describes it: When a chief executive considers clemency, he or she acts as the "distilled conscience" of the citizenry.

Brown, *The Quality of Mercy*, 40 UCLA L. Rev. at 328-30 (footnotes omitted) (emphasis added).

In sum, clemency determinations by the Executive Branch are fundamentally different than adjudicatory proceedings within the Judicial Branch. Bacon's unilateral attempt, therefore, to superimpose recusal principles developed by, and applicable to, judges is wholly foreign to the executive's consideration of clemency requests.

Moreover, we do not read *Woodard* to diminish substantially the undeniable textual commitment of clemency to the Executive Branch of government. By analogy to presidential clemency powers, see U.S. Const. art. II, § 2(1) (President has the "power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment"), we do not believe that Bacon's proposed expansion of the range of justiciable matters relating to executive clemency would be consistent with the federal separation of powers doctrine. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 120, 46 L. Ed. 2d 659, 745 (1976)

**BACON v. LEE**

[353 N.C. 696 (2001)]

(per curiam); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629-30, 79 L. Ed. 1611, 1620 (1935); *Kilbourn v. Thompson*, 103 U.S. 168, 190-91, 26 L. Ed. 377, 387 (1880). As recently expressed by Justice Breyer:

> [T]he principal function of the separation of powers[] . . . is to maintain the tripartite structure of the . . . Government—and thereby protect individual liberty—by providing a "safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley*, [424 U.S. at 122, 46 L. Ed. 2d at 746]. *See* The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison) (separation of powers confers on each branch the means "to resist encroachments of the others"); *see also, e.g., Bowsher v. Synar*, 478 U.S. 714[, 92 L. Ed. 2d 583] (1986) (invalidating congressional intrusion on Executive Branch); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50[, 73 L. Ed. 2d 598] (1982) (Congress may not give away Article III "judicial" power to an Article I judge); *Myers v. United States*, 272 U.S. 52[, 71 L. Ed. 160] (1926) (Congress cannot limit President's power to remove Executive Branch official).

*Clinton v. City of New York*, 524 U.S. 417, 482, 141 L. Ed. 2d 393, 441 (1998) (Breyer, J., dissenting) (citations omitted).

In *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443, 53 L. Ed. 2d 867, 891 (1977), the United States Supreme Court applied a two-part test to resolve a separation of powers challenge. According to the Court, "in determining whether [the challenged assertion of power] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* Next, assuming the potential for disruption is present, the Court must "determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority" of the intervening branch of government. *Id.* Application of this two-part test suggests to us that Bacon's requested superimposition of judicial recusal principles upon the executive—if occurring at the federal level—would likely violate the federal separation of powers doctrine. Similarly, "[b]ecause [state] clemency [procedures] involve acts of mercy that are not constitutionally required," *Duvall v. Keating*, 162 F.3d at 1061, expanding *Woodard* to make a state executive's background or life experiences the subject of an adjudicatory proceeding is likewise unjustified.

BACON v. LEE

[353 N.C. 696 (2001)]

Bacon contends, and we agree, that separation of powers principles under North Carolina law must necessarily yield when inconsistent with federal law. *See* U.S. Const. art. VI, cl. 2. Unlike the United States Constitution,[7] however, the Constitution of North Carolina includes an *express* separation of powers provision. N.C. Const. art. I, § 6 ("The legislative, executive, and supreme judicial powers of the State government·shall be forever separate and distinct from each other."). Moreover, the separation of powers doctrine is well established under North Carolina law. *See State ex rel. Wallace v. Bone*, 304 N.C. 591, 595-601, 286 S.E.2d 79, 81-84 (1982) ("Since North Carolina became a state in 1776, three constitutions have been adopted . . . . [E]ach of our constitutions has explicitly embraced the doctrine of separation of powers."); *Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 503, 115 S.E. 336, 339 (1922) (the judiciary has no supervisory power over the legislature performing its constitutional duty of levying taxes under the North Carolina Constitution); *State v. Holden*, 64 N.C. 829, 830 (1870) (the power of the Governor to declare a county or counties in a state of insurrection and to call out the militia is a discretionary power "vested in the Governor by the Constitution and laws of the State, and cannot be controlled by the judiciary.").

Therefore, similar to the due deference the federal judiciary naturally exhibits toward the President's exercise of clemency authority by virtue of the separation of powers doctrine, we likewise believe that this Court should exhibit a similar, or perhaps even greater, deference toward a Governor's exercise of clemency authority when, as here, the people have included an *express* separation of powers provision within their State Constitution. *Cf. Printz v. United States*, 521 U.S. 898, 918-22, 138 L. Ed. 2d 914, 934-36 (1997) (recognizing the importance of our nation's dual "spheres" of government as a guarantor of liberty complementary to the separation of powers doctrine).

Because we are not persuaded that *Woodard* intended to transform state clemency procedures into another adjudicatory proceeding, we note the basic premise of the political question doctrine

7. Although the separation of powers doctrine is incontrovertibly a fundamental characteristic of our national constitutional landscape, nowhere in the United States Constitution is this principle stated expressly. *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 201, 72 L. Ed. 845, 849 (1928); *see also* The Federalist No. 47 (James Madison) (rejecting the proposition put forth by "respectable adversaries to the Constitution" that the United States Constitution is violative of the separation of powers doctrine as espoused by Montesquieu).

**BACON v. LEE**

[353 N.C. 696 (2001)]

to the extent it helps explain the traditional nonjusticiability of federal and state clemency procedures. The political question doctrine controls, essentially, when a question becomes "not justiciable . . . because of the separation of powers provided by the Constitution." *Powell v. McCormack*, 395 U.S. 486, 517, 23 L. Ed. 2d 491, 514 (1969). "The . . . doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill-suited to make such decisions . . . ." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230, 92 L. Ed. 2d 166, 178 (1986). "It is well established that the . . . courts will not adjudicate political questions." *Powell*, 395 U.S. at 518, 23 L. Ed. 2d at 515. A question may be held nonjusticiable under this doctrine if it involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217, 7 L. Ed. 2d 663, 686 (1962). In the present case, Article III, Section 5(6) of the State Constitution expressly commits the substance of the clemency power to the sole discretion of the Governor. N.C. Const. art. III, § 5(6). Thus, beyond the minimal safeguards applied to state clemency procedures by *Woodard*, judicial review of the exercise of clemency power would unreasonably disrupt a core power of the executive.

In view of the foregoing, we conclude that Bacon's demand for the equivalent of a judicial arbiter to consider his clemency request does not fall within the minimal due process rights applied by *Woodard* to state clemency procedures.[8] Bacon's due process claim therefore fails as a matter of law.

Alternatively, even if Bacon adequately alleges a *Woodard* violation, the Governor cannot delegate the exercise of the clemency authority under Article III, Section 5(6) of the State Constitution. As such, the Rule of Necessity applies, enabling Governor Easley to consider Bacon's clemency request.

Article III, Section 5 of the State Constitution enumerates the express duties of the Governor. N.C. Const. art III, § 5. One of these express duties is the clemency power. N.C. Const. art III, § 5(6). The

8. We observe that the myriad of constitutional and prudential justifications supporting the executive's discretionary and exclusive role in clemency would easily support, in the absence of a *Woodard* violation, the erection of a presumption of nonjusticiability of clemency determinations. *Cf. Heckler v. Chaney*, 470 U.S. 821, 84 L. Ed. 2d 714 (1985).

exercise of clemency power is the "exclusive prerogative" of the Governor and cannot be delegated. *See State v. Lewis*, 226 N.C. 249, 251, 37 S.E.2d 691, 693 (1946) (construing clemency provision of the Constitution of 1868); *State v. Clifton*, 125 N.C. App. 471, 481, 481 S.E.2d 393, 399, *disc. rev. improvidently allowed*, 347 N.C. 391, 493 S.E.2d 56 (1997); *see also Messages, Addresses, and Public Papers of Terry Sanford: Governor of North Carolina* 552 (M. Mitchell ed. 1966) ("To decide when and where such mercy should be extended is a decision which must be made by the Executive. It cannot be delegated even in part to anyone else, and thus the decision is a lonely one.").[9]

Bacon nonetheless argues that Article III, Section 6 of the State Constitution allows the Governor to delegate the clemency power to the Lieutenant Governor. *See* N.C. Const. art. III, § 6 (Lieutenant Governor "shall perform such additional duties as the . . . Governor may assign to him.") We do not agree. The people of North Carolina have consistently reposed in their Governor the virtually unlimited power to bestow mercy upon persons convicted of crime. *See* N.C. Const. of 1776, § XIX; N.C. Const. of 1868, art. III, § 6; N.C. Const. of 1971, art. III, § 5(6). With this trust and responsibility comes the associated political accountability that, again, rests solely in the person of the Governor.

Under our State Constitution, the people have specified that the Lieutenant Governor may only act as Governor in the case of the Governor's absence "from the State, or during the physical or mental incapacity of the Governor to perform the duties of his office." N.C. Const. art. III, § 3(2). None of those conditions have been alleged, nor do they appear in the record. Accordingly, only the Governor, or the Lieutenant Governor in his or her capacity as Acting Governor under Article III, section 3(2), may exercise the clemency authority established by the people of North Carolina in their Constitution.

We therefore invoke the Rule of Necessity and conclude that, even if any of Bacon's claims are cognizable in a court of law, the Governor nonetheless remains fully able to consider, and resolve, Bacon's clemency request. *See, e.g., United States v. Will*, 449 U.S. 200, 213-15, 66 L. Ed. 2d 392, 405-06 (1980); *Bolin v. Story*, 225 F.3d 1234, 1238-39 (11th Cir. 2000); *Long v. Watts*, 183 N.C. 99, 102, 110

---

9. Courts in other states have reached a similar conclusion. *See, e.g., Ex parte Lindsey*, 47 Ala. App. 729, 261 So. 2d 68 (1972); *In re McKinney*, 33 Del. 434, 138 A. 649 (1927); *People ex rel. Milburn v. Nierstheimer*, 401 Ill. 465, 82 N.E.2d 438 (1948); *In re St. Amour*, 127 Vt. 576, 255 A.2d 667 (1969).

S.E. 765, 767 (1922). We draw further support from federal cases that have applied the Rule of Necessity within the specific context of state clemency procedures. *See Buchanan v. Gilmore*, 139 F.3d at 983-84; *Pickens v. Tucker*, 851 F. Supp. at 365-66. In both *Buchanan* and *Pickens*, as here, the respective State Constitutions vested clemency power exclusively in the Governor and provided that the Lieutenant Governor could act only when the Governor was unable to perform his duties. *Buchanan*, 139 F.3d at 983; *Pickens*, 851 F. Supp. at 366. Accordingly, despite the fact that each Governor had formerly served as Attorney General, the courts applied the Rule of Necessity and determined that the Governor could exercise his exclusive clemency authority. Likewise, in the present case, the Rule of Necessity operates to enable Governor Easley to consider, and resolve, Bacon's clemency request.[10]

III.

[2] Bacon alleges, in his second claim for relief, that Governor Easley's consideration of his clemency request violates his right to equal protection of the law under the United States Constitution.[11] Specifically, Bacon alleges that equal protection is denied where "one group of convicted capital defendants will have their clemency petitions decided by a neutral and impartial decision-maker, and another group, similarly situated, by a decision-maker who does not qualify as neutral and impartial because of his previous involvement in their cases as Attorney General, or local prosecutor."

We observe, as an initial matter, that *Woodard* did not recognize an equal protection claim within the context of executive clemency. *Woodard*, 523 U.S. 272, 140 L. Ed. 2d 387. In any event, Bacon's equal protection claim fails because we cannot conclude that Bacon has been, or will be, treated differently for purposes of pursuing clemency than other similarly situated death row inmates. *See*

---

10. We summarily reject Bacon's argument that the Rule of Necessity is trumped by his *Woodard* arguments under the Supremacy Clause of the United States Constitution. See U.S. Const. art. VI, cl. 2. The Rule of Necessity is a doctrine recognized within federal jurisprudence and routinely applied by the federal courts. *See, e.g., United States v. Will*, 449 U.S. 200, 66 L. Ed. 2d 392.

11. Bacon also asserts an equal protection claim under Article I, Section 19 of the State Constitution. When resolving challenged classifications under the equal protection clause of the State Constitution, this Court applies the same test used by federal courts under the parallel clause in the United States Constitution. *See Department of Transp. v. Rowe*, —— N.C. ——, ——, —— S.E.2d ——, —— (July 20, 2001) (No. 506A98-2); *Duggins v. N.C. State Bd. of Certified Pub. Accountant Exam'rs*, 294 N.C. 120, 131, 240 S.E.2d 406, 413 (1978).

*Nordlinger v. Hahn*, 505 U.S. 1, 10, 120 L. Ed. 2d 1, 12 (1992) (requiring a minimal showing that defendants treated similarly situated persons differently to support an equal protection claim); *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 60 L. Ed. 2d 870, 884 (1979) (citing the "settled rule that the Fourteenth Amendment guarantees equal laws, not equal results"); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33, 36 L. Ed. 2d 16, 43 (1973) ("It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws."). Accordingly, Bacon's equal protection claim fails as a matter of law.

Bacon also alleges, in his third claim for relief, a violation of his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. Bacon's claim rests upon the premise that "a capital punishment system without clemency would constitute cruel and unusual punishment." Accordingly, he argues, "the Constitution must give some structural limitation to what constitutes a clemency proceeding."

Bacon's basic premise—that clemency is constitutionally required in a capital punishment system—is erroneous as a matter of law. In *Herrera* the United States Supreme Court observed that "although the Constitution vests in the President a pardon power, it does not require the States to enact a clemency mechanism." 506 U.S. at 414, 122 L. Ed. 2d at 225; *see also Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) ("The Constitution of the United States does not require that a state have a clemency procedure . . . ."); *Duvall v. Keating*, 162 F.3d at 1062 (finding no basis for the plaintiffs' allegation of an Eighth Amendment violation within the clemency context). Consequently, Bacon's Eighth Amendment claim fails as a matter of law.

IV.

**[3]** We now consider Bacon's claims asserted directly under the Constitution of North Carolina. *See Corum v. University of North Carolina*, 330 N.C. 761, 413 S.E.2d 276, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992). Within his first, second, and third claims for relief, Bacon asserts claims under Article I, Sections 1, 19, 21, 27, and 35 of the State Constitution.

Bacon's principal claim under the State Constitution arises under the law of the land clause. See N.C. Const. art. I, § 19. We have previ-

ously determined that the term "law of the land" as used in this provision is synonymous with "due process of law" as used in the Fourteenth Amendment to the United States Constitution. *In re Moore*, 289 N.C. 95, 98, 221 S.E.2d 307, 309 (1976). While "[d]ecisions by the federal courts as to the construction and effect of the due process clause of the United States Constitution are binding on this Court . . . , such decisions, although persuasive, do not control an interpretation by this Court of the law of the land clause in our state Constitution." *McNeill v. Harnett County*, 327 N.C. 552, 563, 398 S.E.2d 475, 481 (1990); *see also State v. Carter*, 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988) (recognizing that this Court "ha[s] the authority to construe [the Constitution of North Carolina] differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision"); *Bulova Watch* Co., 285 N.C. at 474, 206 S.E.2d at 146 (observing that "in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding on this Court").

Since the establishment of their first Constitution in 1776, the people of North Carolina have committed the power to grant or deny clemency to the sole discretion of the Governor. *See* N.C. Const. of 1776, § XIX; N.C. Const. of 1868, art. III, § 6; N.C. Const. of 1971, art. III, § 5(6). Moreover, in each of their three Constitutions, the people have included an express separation of powers clause. *See* N.C. Const. of 1776, Declaration of Rights § 4; N.C. Const. of 1868, art. I, § 8; N.C. Const. of 1971, art. I, § 6. Under the present Constitution, the separation of powers clause provides that "[t]he legislative, executive, and supreme judicial power of the State government *shall be* forever separate and distinct from each other." N.C. Const. art. I, § 6 (emphasis added). As noted in an eminent treatise on the State Constitution, "separation of powers is one of the fundamental principles on which [North Carolina] government is constructed." *See* Orth, *The North Carolina State Constitution: A Reference Guide* 42. The same Constitution establishing the judicial power in the Judicial Branch, and vesting the exclusive authority to resolve clemency requests in the Executive Branch, provided that the operation of these functions be "forever separate and distinct." N.C. Const. art. I, § 6.

As a result, we conclude that the framers of our State Constitution, in contemplating clemency, did not intend to impose additional constraints upon their executive's discharge of clemency power beyond those applicable to state clemency procedures under the United States Constitution. As such, to the extent that due process rights apply to clemency procedures in North Carolina, they extend no further than the minimal due process rights required by *Woodard.* Therefore, Bacon's state constitutional claims—all essentially attacks on the Governor's exercise of clemency power—are not reviewable beyond the minimal safeguards applied to state clemency procedures by *Woodard.*

Accordingly, we reverse the order of the trial court dated 15 May 2001 and remand this case to the trial court with instructions to enter an order of dismissal with prejudice as to all claims asserted by plaintiff Robert Bacon. We further direct the trial court to enter an order of dismissal without prejudice as to all claims asserted by the remaining named plaintiffs.

REVERSED.