IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-104

No. 19A21

Filed 24 September 2021

IN THE MATTER OF: D.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 22 September 2020 by Judge Christopher B. McLendon in District Court, Martin County. This matter was calendared for argument in the Supreme Court on 19 August 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*J. Edward Yeager, Jr., for petitioner-appellee Martin County Department of Social Services.*

*Carrie A. Hanger for appellee Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellant father.*

*Garron T. Michael for respondent-appellant mother.*

BERGER, Justice.

¶ 1    Respondents appeal from the trial court's order terminating their parental rights to D.C. (David).[1]  We affirm.

**Factual and Procedural Background**

¶ 2    The Martin County Department of Social Services (DSS) filed a petition

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

alleging that David was a neglected and dependent juvenile. Through Child Protective Services (CPS), DSS had a history with respondents' family dating back to December 2008. DSS received approximately ten CPS reports from 2008 until the filing of the petition. DSS alleged in the petition issues concerning substance abuse, injurious environment, and truancy.

¶ 3        Since April 2017, DSS had been working with respondents' family trying to assist them in obtaining substance abuse treatment and mental health services. DSS further asserted that even though respondent-father had completed his recommended substance abuse assessment, he failed to disclose his substance abuse issues. As a result of respondent-father's failure to disclose, no services were recommended to address substance abuse issues. The day before DSS filed the petition, respondent-father was incarcerated.

¶ 4        In addition, respondent-mother tested positive for cocaine, opioids, and marijuana, and was in and out of jail because of probation violations. She was noted as being "very resistant" to receiving help with her drug addiction.

¶ 5        In October 2017, DSS was informed that a probation officer went to respondents' residence, tested respondent-mother for drugs, and conducted a search of the location. The probation officer found a young female in a bathroom "getting ready to shoot up." A further search of the home disclosed needles under a bathroom sink near David's bedroom as well as a tourniquet and a spoon. The probation officer

also found a needle cap and a used condom in David's bedroom. One of respondents' children told law enforcement that the woman who was found using drugs lived in the home and slept in David's bedroom.

¶ 6 DSS interviewed respondents while they were both in custody and unable to provide for David's care and supervision. Both respondents were observed with fresh "track marks" on their arms. Respondent-father admitted to being addicted to heroin and needing long term treatment. Respondent-mother acknowledged that she had a problem with drugs. DSS obtained nonsecure custody for David on October 11, 2017.

¶ 7 David was adjudicated to be a neglected and dependent juvenile based on stipulations made by respondents. In a separate dispositional order entered in February 2018, the trial court ordered that legal custody remain with DSS and granted it placement authority. Respondent-mother was allowed a minimum of two hours of supervised visitation every two weeks. The respondents were further ordered to work on a plan of reunification.

¶ 8 A review hearing was held on March 27, 2018. At that time, respondent-mother was incarcerated. Respondent-father was out of jail but had criminal charges pending. The trial court determined that respondent-father appeared to be impaired during one meeting at DSS. Respondent-father completed a psychiatric evaluation and was diagnosed with "Opioid Use Disorder, Severe, in Early Remission." The

permanent plan for David was set as reunification. At a subsequent review hearing, the trial court set a secondary permanent plan of guardianship.

¶ 9          The trial court held a permanency planning review hearing in September 2018. The trial court found that respondent-mother had missed the majority of her Substance Abuse Intensive Outpatient Treatment sessions, missed her appointment for her psychological evaluation, had not contacted DSS or visited with David since August 2018, and had not started parenting classes. Additionally, respondent-mother indicated that she did not wish to work on a plan of reunification and approved of David's current custodians being named his guardians.

¶ 10         The trial court found that respondent-father cancelled a substance abuse assessment because he believed his participation in Narcotics Anonymous was sufficient, failed to start parenting classes, had not visited David since July 2018, failed two drug tests, and did not appear interested in working on a plan of reunification. The trial court relieved DSS of further reunification efforts and changed the primary permanent plan to guardianship. The trial court subsequently changed the primary permanent plan to adoption with a secondary permanent plan of guardianship due to ongoing concerns regarding substance abuse. In a permanency planning review order entered on December 9, 2019, the trial court ordered DSS to file a motion to terminate respondents' parental rights.

¶ 11         On March 11, 2020, DSS filed a petition to terminate respondents' parental

rights on the grounds of neglect, willful failure to make reasonable progress, failure to pay for the cost of care for the juvenile, and dependency. N.C.G.S. § 7B-1111(a)(1)– (3), (6) (2019). Following a hearing, the trial court determined that grounds existed to terminate respondents' parental rights as alleged in the petition. The trial court further concluded it was in David's best interests that respondents' parental rights be terminated, and terminated respondents' parental rights. Respondents appeal.

**Standard of Review**

¶ 12     A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(f) (2019). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). If the petitioner meets its burden during the adjudicatory stage, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485

S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110).

¶ 13    "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019) (citations omitted). We begin our analysis with consideration of whether grounds existed pursuant to N.C.G.S. § 7B-1111(a)(3) to terminate respondents' parental rights.

## Analysis

¶ 14    A trial court may terminate parental rights pursuant to N.C.G.S. § 7B-1111(a)(3) where:

> The juvenile has been placed in the custody of a county department of social services, a licensed child-placing agency, a child-caring institution, or a foster home, and the parent has for a continuous period of six months immediately preceding the filing of the petition or motion willfully failed to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.

N.C.G.S. § 7B-1111(a)(3) (2019). This Court has stated that:

> The cost of care refers to the amount it costs the Department of Social Services to care for the child, namely, foster care. A parent is required to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay.

*In re J.M.*, 373 N.C. 352, 357, 838 S.E.2d 173, 176–77 (2020) (cleaned up).

¶ 15      Here, in support of its conclusion that grounds existed pursuant to N.C.G.S.

§ 7B-1111(a)(3) to terminate respondents' parental rights, the trial court made the

following findings of fact:

> [16]a. The juvenile has been in the legal custody of [DSS]
> for the past thirty-four (34) months. He is placed in a foster
> home through the foster care system, which entails
> numerous expenses to provide for his case.
>
> [16]b. Neither respondent-parent has paid any child
> support or given [DSS] or the foster parents any money
> that would pay a reasonable portion of the cost of care for
> the juvenile. The respondent-parents have provided the
> juvenile with some food and gifts at visitation, and also
> given the juvenile some small amount of spending money.
>
> [16]c. Each parent is physically able to work, although
> there was a period during an unsuccessful pregnancy in
> 2018-19 in which respondent-mother could not work. Each
> parent has worked at a lawn care business they started at
> the beginning of 2020.
>
> 16[d]. Each parent is financially able to pay a reasonable
> portion of the cost of care for the juvenile. Respondent-
> mother reports that the lawn care business has been even
> more successful than they envisioned, and they are able to
> earn enough income to support themselves and their
> children.

¶ 16      Respondents do not challenge the trial court's findings of fact regarding this

statutory ground.[2] *See In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019)

(stating that "[f]indings of fact not challenged by respondent are deemed supported

---

[2] Respondents make arguments regarding findings of fact 14 and 17, but we do not
address them because they are not relevant to grounds for termination under N.C.G.S. § 7B-
1111(a)(3). *In re N.G.*, 374 N.C. 891, 900, 845 S.E.2d 16, 23 (2020).

by competent evidence and are binding on appeal."). Respondents instead claim that the trial court failed to make any findings of fact that they had received notice that they were under any obligation to make payments to DSS or the foster parents for David's care. Respondents contend that without notice of such obligation, they could not have acted willfully. Respondents thus assert that the trial court erred by concluding grounds exist to terminate their parental rights pursuant to N.C.G.S. § 7B-1111(a)(3) because their failure to pay was not willful.

¶ 17     Respondents' argument is nearly identical to that raised by the respondent-mother in *In re S.E.*, 373 N.C. 360, 838 S.E.2d 328 (2020). In *In re S.E.*, the respondent-mother conceded that she did not pay anything towards the cost of care for her children but similarly claimed that her failure to pay was not willful. The respondent argued that she could have paid, but "she did not know she could pay towards the cost of care for her children, did not know how to pay towards the cost, and could not reasonably have been expected to do so." *Id.* at 365, 838 S.E.2d at 332. This Court disagreed, holding that:

> Respondent-mother's argument that she did not know she had to pay a reasonable portion of the cost of care for her children or how to do so is fundamentally without merit. The absence of a court order, notice, or knowledge of a requirement to pay support is not a defense to a parent's obligation to pay reasonable costs, because parents have an inherent duty to support their children. Given her inherent duty to support her children, respondent cannot hide behind a cloak of ignorance to assert her failure to pay a reasonable portion of the cost of care for her children was

not willful.

*Id.* at 366, 838 S.E.2d at 333 (cleaned up).

¶ 18     Respondents contend that we should disavow *In re S.E.* Respondents claim that the interpretation of N.C.G.S. § 7B-1111(a)(3) as set forth in *In re S.E.*, when compared to termination for lack of support pursuant to N.C.G.S. § 7B-1111(a)(4)[3], "results in an unconstitutional dichotomy, under which similarly situated parents are treated differently depending on who the child's custodian is." Respondents argue that "the General Assembly could not have possibly intended to hold only some parents to a strict liability standard, for doing so would result in an unconstitutional outcome in which those parents are deprived of the equal protection of the law."

¶ 19     Adhering to the principle of *stare decisis*, we decline to change our interpretation of N.C.G.S. § 7B-1111(a)(3). This Court has stated:

> It is . . . an established rule to abide by former precedents, *stare decisis*, where the same points come up again in litigation, as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion, as also because, the law in that case being solemnly declared and determined what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or swerve from according to his

---

[3] Section 7B-1111(a)(4) provides that a trial court may terminate parental rights where "[o]ne parent has been awarded custody of the juvenile by judicial decree or has custody by agreement of the parents, and the other parent whose parental rights are sought to be terminated has for a period of one year or more next preceding the filing of the petition or motion willfully failed without justification to pay for the care, support, and education of the juvenile, as required by the decree or custody agreement." N.C.G.S. § 7B-1111(a)(4) (2019).

> private sentiments; he being sworn to determine, not according to his private judgment, but according to the known laws and customs of the land—not delegated to pronounce a new law, but to maintain and expound the old one—*jus dicere et non jus dare.*

*McGill v. Town of Lumberton*, 218 N.C. 586, 591, 11 S.E.2d 873, 876 (1940) (cleaned up); *see also Bacon v. Lee*, 353 N.C. 696, 712, 549 S.E.2d 840, 851–52 (2001) ("A primary goal of adjudicatory proceedings is the uniform application of law. In furtherance of this objective, courts generally consider themselves bound by prior precedent, i.e., the doctrine of *stare decisis.*" (citing *Payne v. Tennessee*, 501 U.S. 808, 827, 115 L.Ed.2d 720, 736–37 (1991)).

The trial court's unchallenged findings of fact demonstrate that respondents had the ability to pay a reasonable portion of David's cost of care but failed to pay any amount to DSS or the foster parents toward cost of care. Accordingly, we conclude that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(3) to terminate respondents' parental rights.

We next consider respondent-father's argument that the trial court conducted the adjudicatory hearing under a fundamental misapprehension of the law. Respondent-father claims that the trial court "conducted the adjudication hearing under the fundamentally misguided belief that parent and child were adversaries— that is, that young David's interests took priority over his parents' constitutionally protected rights." *See Santosky v. Kramer*, 455 U.S. 745, 760, 71 L. Ed. 2d 599, 610

(1982) (stating that "[a]t the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge."). We are not persuaded.

¶ 22 As noted previously herein, a termination of parental rights proceeding consists of two stages, an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. at 110, 316 S.E.2d at 252. This Court has often stated that in proceedings conducted under the North Carolina Juvenile Code, the best interests of the juvenile are paramount. *See, e.g., In re T.H.T.*, 362 N.C. 446, 450, 665 S.E.2d 54, 57 (2008) (affirming that the child's best interests constitute "the 'polar star' of the North Carolina Juvenile Code"); *see also In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 246. However, a trial court only proceeds to "the dispositional stage at which point it must determine whether terminating the parent's rights is in the juvenile's best interests" after it "determines at the adjudicatory stage that one or more of the grounds in N.C.G.S. § 7B-1111(a) exists to terminate parental rights." *In re K.L.M.*, 375 N.C. 118, 121, 846 S.E.2d 488, 490 (2020). Thus, until the trial court has concluded at the adjudicatory stage that a ground exists to terminate parental rights, "the constitutionally[ ]protected paramount right of parents to custody, care, and control of their children must prevail." *Petersen v. Rogers*, 337 N.C. 397, 403–04, 445 S.E.2d 901, 903 (1994).

¶ 23    Respondent-father's argument that the trial court focused on David's interests, rather than respondents' constitutionally protected rights to preserve their family intact, and erroneously placed David and respondents in adversarial roles, is based upon a statement made by the trial court at the conclusion of the adjudicatory phase of the termination hearing. The trial court stated that "[w]e're here for -- not for [respondents]. We're here for this child."

¶ 24    At the conclusion of the adjudicatory portion of the termination hearing, the trial court's full statement was:

> Well the case is made more difficult than a lot of these because just of the length of time it took for [respondents] to see the light. We're here for -- not for [respondents]. We're here for this child. Had [respondents] taken the steps early on that I think these lawyers have finally got them at least going on, then we wouldn't be here in the situation where [David] had been gone so long. But the court does find that there's evidence to these grounds alleged in the petition.

When read in its entirety and in context, it is apparent that the trial court was not acting under a misapprehension of law. First, the trial court noted in its pre-trial order that "[t]his matter shall proceed to adjudication, and, *if warranted*, to disposition[.]" (Emphasis added) *See In re K.L.M.,* 375 N.C. 118, 121, 846 S.E.2d 488, 490 (2020). The trial court recognized that respondents had a constitutionally protected interest in preserving familial bonds and that the matter would not proceed to disposition unless grounds for termination were proven. The trial court's

statements further recognize that respondents acted inconsistently with that interest, parental unfitness had been established, and the trial court would be proceeding to the dispositional phase of the proceeding where determination of David's best interests would be paramount. We therefore conclude that the trial court was not acting under a misapprehension of the law at adjudication.

The trial court's conclusion that a ground for termination existed pursuant to N.C.G.S. § 7B-1111(a)(3) is sufficient in and of itself to support termination of respondents' parental rights. *In re E.H.P.*, 372 N.C. at 395, 831 S.E.2d at 53. As such, we need not address respondents' arguments regarding N.C.G.S. § 7B-1111(a)(1), (2) and (6). Furthermore, respondents do not challenge the trial court's conclusion that termination of their parental rights was in David's best interests. *See* N.C.G.S. § 7B-1110(a) (2019). Accordingly, we affirm the trial court's order terminating respondents' parental rights to David.

AFFIRMED.